1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9               FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   RACHAEL AKEY, et al.,                    No.  2:14-cv-2402 KJM DB

12                  Plaintiffs,

13          v.                                ORDER

14   PLACER COUNTY, et al.,

15                  Defendants.

16   _____

17

18          A three-year-old boy complained that his stepfather tried to choke him.  His

19   teachers reported this allegation to Placer County Child Protective Services ("CPS").  The next

20   day, and without written consent from the child's mother, CPS workers arranged for the child to

21   stay with his biological father pending an investigation.  The child, his mother and his stepfather

22   now sue Placer County and two CPS workers for federal and state civil rights violations.  Three

23   motions are before the court: Defendants' and plaintiffs' cross-motions for summary judgment

24   and plaintiffs' motion to amend.  ECF Nos. 135-136, 138.  The court heard all motions on

25   November 3, 2017.  Hr'g Mins., ECF No. 148.  As explained below, the court partially GRANTS

26   defendants' summary judgment motion but DENIES plaintiffs' motions.

27   ////

28   ////

1    I.    BACKGROUND

2            The following facts, which derive from both parties' statements of undisputed

3    material facts, are undisputed unless otherwise stated.  *See* Defs.' Statement of Facts ("DF"), ECF

4    No. 134-2; Pls.' Statement of Facts ("PF"), ECF No. 135-2.  Although parties may object to

5    evidence cited in support of purportedly undisputed facts, *see In re Oracle Corp. Sec. Litig.*,

6    627 F.3d 376, 385-86 (9th Cir. 2010), the evidentiary admission standard at this stage is lenient:

7    A court may evaluate evidence in an inadmissible form if the evidentiary objections could be

8    overcome at trial, *Burch v. Regents of the Univ. of Cal.*, 433 F. Supp. 2d 1110, 1119-20 (E.D. Cal.

9    2006).

10           A.    The Choking Allegation

11           At all relevant times, plaintiff N.D. was a three-year-old boy living with his

12   mother, plaintiff Rachael Akey, and his stepfather, plaintiff Ryan Cornacchioli.  DF[1] 4, 14.

13   N.D.'s biological father, Cameron Dupree, lived elsewhere.  DF 4.  In July 2013, two months

14   before the choking allegation at issue here, Akey and Dupree had ended a lengthy custody battle.

15   DF 1-2.  The family court ordered N.D. to live with Akey, based in part on Dupree's history of

16   drug use, but granted Dupree custody every other weekend and one weekday.  DF 3-4.

17           On September 12, 2013, N.D.'s school reported to CPS that one day prior N.D.

18   mentioned that his stepfather tried to choke him.  DF 5.  CPS worker defendant Gloria Sutton was

19   assigned to investigate the allegation.  DF 6-7, 13.  She immediately reviewed N.D.'s file history,

20   which showed N.D. had been the subject of nine prior abuse and negligence complaints, one

21   involving Cornacchioli and several others involving Akey's prior boyfriends.[2]  DF 8-10.  The

22   incident involving Cornacchioli was reported by N.D.'s father's fiancé, Sarah Christenson,

23

24           [1] Unless otherwise noted, whenever the court cites to plaintiffs' or defendants' facts, the
     court has verified that each fact is supported by the record.

25
             [2] Plaintiffs argue this is inadmissible character evidence, unfairly prejudicial and
26   irrelevant.  *See* ECF No. 143 at 4-6 (responses to DF 8-11).  The court finds the evidence is
     relevant and probative as it shows Sutton's investigative process and her basis for believing N.D.
27   was in danger, both of which this case directly challenges.  *See infra* Part IV.  The objection is
     OVERRULED.
28

approximately eight months before the alleged choking incident here. DF 10; *See* Incident Report, Defs.' Ex. E, ECF No. 134-4 (incident date Jan. 17, 2013). That prior incident pertained to allegations that Cornacchioli had poured hot sauce into N.D.'s mouth after N.D. said a "bad word." DF 10; Incident Report at 1. The findings as to the alleged hot sauce incident were ultimately "inconclusive," but the report noted Akey verbally agreed not to let Cornacchioli watch her children. DF 11; Incident Report at 4.

Sutton asked Dupree, N.D.'s father, for permission to interview N.D. about the allegation. DF 13. With Dupree's permission, Sutton went to N.D.'s school to talk to him. DF 13. N.D. repeated his allegation, while saying he "liked" Cornacchioli and "was not afraid of him," but saying Cornacchioli "tried to kill him" because he was "being bad at school." DF 14-15, 40. N.D. demonstrated for Sutton how Cornacchioli had tried to choke N.D. DF 14. Although N.D. did not specify exactly when the choking occurred, he said it happened at his mother's home while his mother was there, but that his mother did not try to stop it. DF 16-17. Sutton did not see any marks or bruising on N.D. PF 28.

Sutton then probed N.D.'s credibility. She spoke to two of N.D.'s teachers, Ms. Lenaburg and Ms. Miller, both of whom recited what N.D. had told them, confirmed their belief that the allegation was serious, and confirmed their views that N.D. is an honest child. DF 19-25. Sutton also called Dupree and Dupree's fiancée, Ms. Christenson, who both confirmed their belief that N.D. is an honest child and that he had mentioned and described the alleged choking incident to them two days earlier. DF 32-34. When asked why they did not report the allegation, Dupree explained he did not feel he could effectively communicate with Akey, given their strained relationship, and that he thought "the court" would not take him seriously given that he had been to court so many times. DF 42; Sutton Decl. (Defs.' Ex. K, ECF No. 134-4) ¶ 30. Although Sutton included Dupree's not reporting the allegation as a point of concern in her report, she deemed his reasons credible, and as unrelated to the veracity or seriousness of N.D.'s allegations. DF 42; Sutton Decl. ¶ 30.

Sutton also called Akey, N.D.'s mother. DF 29. Akey immediately denied the allegation and said the timing was implausible: N.D. reportedly made the allegation on

September 11, 2013, but Cornacchioli had been out of town on military duty from September 6th through 10th. DF 5, 29. Sutton was unpersuaded by Akey's denial, because it was unclear when exactly the alleged choking happened and Sutton believed it was common for abusers and neglecters to deny abuse allegations. DF 31. On September 17, 2013, Sutton interviewed Cornacchioli in person. DF 36. He denied ever choking N.D. and said N.D. "tells stories." DF 36-38.

On September 25, 2013, after reviewing and analyzing all witness statements and CPS's prior investigation reports involving N.D., Sutton filed a report that "substantiated" the choking allegation. DF 44. A month later, Myers, Sutton's supervisor, signed off on Sutton's investigative report. Myers Decl. (Defs.' Ex. L, ECF No. 134-4) ¶ 9.

B. Custody Transfer and the "Safety Plan"

On the day she received the initial abuse report, September 12, but before she substantiated the allegation on September 25, Sutton worried that Akey or Cornacchioli would pick N.D. up from school "at any moment." DF 51-52. So Sutton, aware of the history between the parents and the recent shared custody ruling, devised a "safety plan" that would require N.D. to stay with Dupree pending further investigation. DF 43, 54, 58. Sutton phoned Akey in an effort to convince her to agree to the plan, but citing Dupree's former drug use, Akey refused. DF 55-56. Sutton assured Akey she was aware of Dupree's drug history but that the family court had already addressed the concern in its July 2013 custody order, and if Akey remained concerned Sutton could arrange another drug test. DF 58. Akey still refused. DF 62. Sutton then threatened to remove N.D. with a warrant, but Akey remained steadfast in her refusal. DF 61. Myers also spoke to Akey and tried to convince her to agree to the plan. DF 63. The parties dispute whether Akey ultimately refused the plan. PF 25 (stating Akey refused throughout the phone call with Myers); DF 64 (stating Myers "believed" Akey agreed and "did not hear" Akey refuse). Because Myers believed Akey agreed to the safety plan, neither Myers nor Sutton made a formal, written "exigency" determination, as is required to remove a child without parental consent. DF 85.

4

Although it is disputed whether Akey agreed to let N.D. stay with Dupree, it is undisputed that she did not try to impede the arrangement. DF 46, 68-70. Dupree's fiancée picked N.D. up from school. DF 46. That same day, Sutton visited Dupree's home to determine whether it was suitable to house N.D. DF 35. The very next day, Sutton had Dupree drug tested, the results of which were negative. DF 59-60. N.D. then stayed with Dupree and his fiancé in the days that followed without interference from Akey. DF 68-70. Because Akey did not attempt to interfere, CPS did not bring N.D. into custody or try to formally change the family court's custody order. DF 47, 68-69, 72-73. Instead, Dupree filed with the family court an ex parte application for sole custody pending the investigation's conclusion, which the court granted on September 20, 2013. DF 48-49. N.D. then stayed with Dupree for the next six months. DF 49, PF 43.

Sutton's September 25 report found N.D.'s allegation was "substantiated," meaning Sutton found it more likely than not that the choking incident happened. DF 44. She also substantiated allegations of neglect against Akey, believing it "more likely than not" that Akey (1) had not kept her agreement to prevent Cornacchioli from watching N.D., and (2) had a history of picking abusive partners who mistreated N.D. DF 44. The family court held a full evidentiary hearing on the abuse allegation on October 2, 2013. PF 2, 42. In March 2014, the family court issued its final determination that "no abuse" had occurred. PF 42. The court then reinstated the original custody arrangement giving Akey primary custody and N.D. returned to Akey's house. PF 42.

C.     Department of Justice Child Abuse Central Index

After Sutton completed her report substantiating the choking allegation, and Myers affirmed it, the County prepared forms to add Cornacchioli to the California Department of Justice ("DOJ") Child Abuse Central Index database ("Index"). DF 76. Myers directed his staff to submit to DOJ all the required forms. DF 77. Due to a clerical error, the forms were never actually submitted and Cornacchioli's name was never added to the DOJ Index. DF 77-82.

1        D.    <u>Procedural Background</u>

2            Akey, N.D. and Cornacchioli sue Placer County, Myers and Sutton for civil rights

3    violations, contending Sutton and Myers improperly removed N.D. from Akey's home,

4    wrongfully reported Cornacchioli to the DOJ Index, and investigated the choking allegation in

5    "bad faith" by fabricating and suppressing evidence.  Plaintiffs filed their initial complaint on

6    October 12, 2014, ECF No. 1, and amended their complaint four times, ECF Nos. 20, 29, 38, 109.

7            In the operative fourth-amended complaint ("Compl."), N.D., Akey and

8    Cornacchioli assert twenty-five claims.  *See generally* Compl.  Akey asserts claims both in her

9    own right and as N.D.'s guardian ad litem.  The complaint includes fourteen federal constitutional

10   claims under 42 U.S.C. § 1983.  All plaintiffs assert procedural due process violations (Claims 1,

11   3, 5, 7, 9, 11, 14, 15), but only Akey and N.D. assert substantive due process violations (Claims 2,

12   4, 6, 8, 10, 12).[3]  *Id.* ¶¶ 151-154.  Plaintiffs also bring eleven state constitutional claims, which

13   mirror their federal claims.  *Id.* ¶¶ 177–235 (Claims 16-26).

14           As noted, the parties cross-move for summary judgment.  Pls.' Mot., ECF No.

15   135; Pls.' Mem., ECF No. 135-1; Defs.' Mot., ECF No. 136; Defs.' Mem., ECF No. 136-1.  Both

16   motions are opposed.  Pls.' Opp'n, ECF No. 142; Defs.' Opp'n, ECF No. 141.  Plaintiffs also

17   move to amend the fifteenth claim, ECF No. 138, which defendants oppose, ECF No. 140.  The

18   court first addresses whether summary judgment should be granted on N.D.'s and Akey's claims,

19   and then addresses Cornacchioli's claims as well as plaintiff's motion to amend.

20   II.    <u>LEGAL STANDARD: SUMMARY JUDGMENT</u>

21           A court will grant summary judgment "if . . . there is no genuine dispute as to any

22   material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

23   The "threshold inquiry" is whether "there are any genuine factual issues that properly can be

24   resolved only by a finder of fact because they may reasonably be resolved in favor of either

25   party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

26

27         [3] Although plaintiffs originally brought fifteen § 1983 claims, the court does not address
     their thirteenth claim which the complaint characterizes as "omitted."  Compl. at 43.

28

The moving party bears the initial burden of showing the district court "there is an absence of evidence to support the nonmoving party's case." *Celotex Corp*, 477 U.S. at 325. Then the burden shifts to the non-movant to show "there is a genuine issue of material fact . . . ." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585 (1986). In carrying their burdens, both parties must "cit[e] to particular parts of materials in the record . . . ; or show [] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1); *see also Matsushita*, 475 U.S. at 586 ("[the non-movant] must do more than simply show that there is some metaphysical doubt as to the material facts"). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 247-48.

In deciding summary judgment, the court draws all inferences and views all evidence in the light most favorable to the non-movant. *Matsushita*, 475 U.S. at 587-88. "Where the record taken as a whole could not lead a rational trier of fact to find for the [non-movant], there is no 'genuine issue for trial.'" *Id.* at 587 (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)). District courts should act "with caution in granting summary judgment," and have authority to "deny summary judgment in a case where there is reason to believe the better course would be to proceed to a full trial." *Anderson*, 477 U.S. at 255. A trial may be necessary "if the judge has doubt as to the wisdom of terminating the case before trial," *Gen. Signal Corp. v. MCI Telecomms. Corp.*, 66 F.3d 1500, 1507 (9th Cir. 1995) (quoting *Black v. J.I. Case Co.*, 22 F.3d 568, 572 (5th Cir. 1994)), "even in the absence of a factual dispute[,]" *Rheumatology Diagnostics Lab., Inc v. Aetna, Inc.*, No. 12-05847, 2015 WL 3826713, at *4 (N.D. Cal. June 19, 2015) (quoting *Black*, 22 F.3d at 572).

III.     EVIDENTIARY OBJECTION

Plaintiffs broadly object to the court's considering any facts or arguments relating to Sutton's or Myers' initial belief that Cornacchioli abused N.D. *See* Pls.' Mem. at 11-16. Specifically, plaintiffs argue defendants are collaterally estopped from referencing initial

evidence about the alleged choking incident because the March 2014 family court's order after the evidentiary hearing conclusively held the incident did not happen.  *Id.*

The court disagrees.  Collateral estoppel applies only when the party against whom the doctrine is asserted was "a party or in privity with a party to the prior action."  *Syverson v. Int'l Bus. Machs. Corp.*, 472 F.3d 1072, 1078 (9th Cir. 2007) (citations omitted).  The family custody suit involved only N.D's parents.  DF 20.  Defendants were not parties to or in privity with either parent.  Collateral estoppel does not apply here.  The objection is OVERRULED.

IV.  ANALYSIS: AKEY'S AND N.D.'S § 1983 CLAIMS

Section 1983[4] provides a cause of action for people who believe their federal rights have been violated by someone acting under color of state law.  *Gomez v. Toledo*, 446 U.S. 635, 639 (1980).  Here, it is undisputed defendants Myers and Sutton acted under color of state law: As state CPS workers they investigated N.D.'s abuse allegations and removed N.D. from Akey's house.  Akey and N.D. argue the removal violated procedural due process guarantees because it happened without a hearing and substantive due process guarantees because it interfered with the mother-child relationship.  *See* Pls.' Mem. at 9-10.  As explained below, there are triable issues based on the procedural due process claims, but the court grants summary judgment for Sutton and Myers on the substantive due process claims.

A.  Procedural Due Process (Claims 3, 5, 9, 11)

Very soon after the school reported N.D.'s choking allegation to CPS, Sutton developed a "safety plan" to remove N.D. from Akey's home until she vetted the allegation.  Akey and N.D. contend this custody transfer violated their procedural due process rights because CPS did not obtain a warrant or make any "exigency" determination before removing N.D., nor did Akey consent to N.D.'s removal.  Pls.' Mem. at 9.

---

[4] "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."  42 U.S.C. § 1983.

8

The Fourteenth Amendment protects parents' and their children's "well-elaborated constitutional right to live together without governmental interference." *Wallis v. Spencer*, 202 F.3d 1126, 1136 (9th Cir. 2000) (collecting cases); *see also Troxel v. Granville*, 530 U.S. 57, 65 (2000). This "essential liberty interest . . . guarantee[s] that parents and children will not be separated by the state without due process of law except in an emergency." *Wallis*, 202 F.3d at 1136-37 (9th Cir. 2000) (citations omitted); *Mabe v. San Bernardino Cty*, 237 F.3d 1101, 1107 (9th Cir. 2001). The court evaluates procedural due process claims through a two-step inquiry. The court asks (1) whether defendants deprived plaintiffs of a constitutionally protected liberty or property interest; and if so, (2) whether that deprivation occurred without due process of law. *Zinermon v. Burch*, 494 U.S. 113, 125 (1990).

### 1. Was There a Deprivation?

Defendants argue there was no deprivation because neither Sutton nor Myers removed N.D. from his home or took him into custody. They merely asked Dupree, who had partial custody, to fetch N.D. from school while they investigated N.D.'s choking allegation. DF 46-47.

Although Dupree had some custodial rights over N.D., a reasonable jury here could find a deprivation. There is no indication Dupree would have picked N.D. up unless Sutton and Myers had asked. *Cf. Dees v. Cty. of San Diego*, No. 14-CV-189-BEN (DHB), 2016 WL 9488706, at *7 (S.D. Cal. May 13, 2016) (finding no deprivation where parents had joint custody agreement and government official merely "supported" one parent's decision to keep child on days other parent had custody, as opposed to directing parent to do so). Sutton and Myers asked Dupree to fetch N.D. on a day when Akey was entitled to custody as ordered by the family court. This deprived N.D. of his legitimate interest in being with his mother on days she had custody, and Akey's legitimate interest in having her son at home on those days. *See Wallis*, 202 F.3d at 1136 (defining the liberty interest as a right to "live together without governmental interference"). There is a genuine dispute of material fact as to whether the first step of the due process analysis is satisfied.

## 2.    Was There Sufficient Process?

To intervene in an existing custody arrangement, the state must have sufficient reason and follow proper procedures.  Specifically, government officials must obtain a warrant "unless they possess information at the time of the seizure that establishes reasonable cause to believe that the child is in imminent danger of serious bodily injury and that the scope of the intrusion is reasonably necessary to avert that specific injury."  *Mabe*, 237 F.3d at 1106 (citation and quotations omitted).

Here, Sutton and Myers as CPS officials effected the removal of N.D. from his mother's home without a warrant and without a judicial hearing.  This summary removal violated procedural due process guarantees unless Sutton and Myers developed "reasonable cause to believe that the child [was] in imminent danger of serious bodily injury and that the scope of the intrusion [was] reasonably necessary to avert that specific injury."  *Id.* at 1106 (citation omitted); *see also Mueller*, 700 F.3d 1180, 1186 (9th Cir. 2012).  Although a choking allegation might be able to qualify as an exigency, the parties agree the removal here was not based on "emergency" or "exigency" findings. Pls.' Mem. at 9-10; Defs.' Opp'n at 11-12, 16.

Rather, defendants argue the removal was proper because Akey consented to it. Defs.' Mem. at 20.  Specifically, defendants argue Akey orally agreed to their proposed "safety plan" through which N.D. would stay with Dupree pending resolution of the abuse investigation. *Id*.  The Ninth Circuit has not yet had occasion to address the due process implications of an agreed-upon safety plan to remove a child from a parent's home.  But other Circuits have found that because a safety plan is optional, no further pre-deprivation process is required if a parent consents.  *See Dupuy v. Samuels*, 465 F.3d 757, 763 (7th Cir. 2006) (noting "lawsuits challenging [safety plans] have been rare—indeed this is the first we've found" and recognizing safety plans present a "partial solution to the agonizingly difficult problem of balancing the right of parents to the custody and control of their children with the children's right to be protected against abuse and neglect."); *Smith v. Williams–Ash*, 520 F.3d 596, 600 (6th Cir. 2008) (citing *Dupuy* and reaching same conclusion); *see also Teets v. Cuyahoga Cty., Ohio*, 460 F. App'x 498, *503 (6th Cir. 2012) ("a parent's voluntary consent to a safety plan obviates the need for any additional due

10

1   process procedures on the part of the agency seeking to remove the child from a parent's

2   custody.") (citation omitted).  Conversely, removing a child without the parent's consent triggers

3   additional due process protections, discussed below.  *Cf. Dupuy*, 465 F.3d at 763.

4           Here, the parties dispute whether Akey agreed to the safety plan.  Akey refused the

5   plan when Sutton initially asked, but Meyers "believed" Akey acquiesced when he pressured her

6   further, and claims he never heard her refuse.  DF 64; PF 25; Myers Decl. ¶ 5; Myers Dep. 91:11-

7   18 (Pls.' Ex. 11, ECF No. 135-3) ("What I wanted to clarify is she [Akey] didn't agree to that [the

8   custody arrangement] with Gloria. She did agree to that with me … she agreed to it with me, and

9   she was reluctant to agree to it, but she did agree to it.").  Akey says she never agreed, and even if

10  she did, the agreement was involuntary.  PF 25; Akey Decl. (Pls.' Ex. 16, ECF No. 135-3) ¶ 6;

11  Akey Dep. 130- 33, 147-48 (Pls.' Ex. 4, ECF No. 135-3).  Because the parties executed no

12  written agreement and now dispute whether they reached an oral agreement, whether an

13  agreement ever existed presents a material factual dispute.  *See, e.g., Johnson v. Wang*, No. C16-

14  1738-JLR, 2017 WL 4957709, at *4 (W.D. Wash. Oct. 31, 2017) ("there is a genuine dispute of

15  material fact regarding whether the two [persons] formed an oral contract and if such they formed

16  a contract, what its terms are . . . . Summary judgment is therefore inappropriate.").

17          The court rejects defendants' argument that by not interfering with the safety plan

18  after-the-fact, Akey consented.  *See* Defs.' Mem. at 10.  A reasonable juror could conclude Akey

19  felt she had no choice but to acquiesce.  *See* Akey Dep. 178:8-22 ("Well, yeah. I didn't ever go

20  and pick him up from school. I didn't want to risk my other two children being taken from me.

21  That's why I never showed up"); *Sangraal*, 2013 WL 3187384, at *9 (noting Ninth Circuit has

22  yet to provide a standard for determining when safety plans like the one here are coercive); *cf.*

23  *Akey v. Placer Cty., Cal.*, No. 2:14-CV-02402-KJM, 2015 WL 1291436, at *6 (E.D. Cal. Mar. 20,

24  2015) ("The court considers 'as a question of fact to be determined from the totality of all the

25  circumstances' whether consent to a seizure is "truly voluntary or was the product of duress or

26  coercion, express or implied.") (citation omitted).  But because the record does not show,

27  indisputably, that the parties reached an agreement, the court need not address whether the

28  agreement was voluntary.

If a jury finds there was no agreement, then the jury may reasonably conclude that N.D.'s and Akey's procedural due process rights were violated when CPS removed N.D. without consent, without a warrant, without a hearing, and without having made an exigency determination. *See Ram v. Rubin*, 118 F.3d 1306, 1310 (9th Cir. 1997) (noting parent cannot be "summarily deprived of custody [of his child] without notice and a hearing except when the children were in imminent danger"); *Mabe*, 237 F.3d at 1108 (same).

N.D.'s and Akey's procedural due process claims survive summary judgment.

### 3. Qualified Immunity

Sutton and Myers argue that even if triable issues remain on the procedural due process claims, qualified immunity insulates them from liability. Defs.' Mem. at 11.

Qualified immunity balances "the need to hold [officers] accountable when they exercise power irresponsibly and the need to shield [officers] from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (citations and quotations omitted). This form of immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (citation omitted).

Courts analyze qualified immunity through a two-pronged test. The first prong asks whether, viewed in the light most favorable to plaintiffs, "the facts alleged show the [defendant's] conduct violated a constitutional right"; the second prong asks whether that constitutional right was "clearly established" at the time of the alleged violation. *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *receded from in Pearson*, 555 U.S. at 236 (deciding two prongs can be addressed in any sequence).

Here, as discussed above, the first prong is satisfied: A rational juror could conclude defendants violated Akey's and N.D.'s procedural due process rights by effectively removing N.D. from Akey's home without consent, without a warrant, without a hearing and without any exigency determination.

The question remaining is whether these rights were so "clearly established" that every reasonable social worker confronting this same scenario in September 2013 would have

known removing N.D. from Akey's home in this way violated the law. The Supreme Court recently "reiterate[d] the longstanding principle that 'clearly established law' should not be defined at a high level of generality"; instead, it must be "particularized' to the facts of the case." *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (citation and quotations omitted).

Here, every reasonable official in September 2013 would have known it was unlawful to remove N.D. under the factual scenario outlined above. *See supra* Part III.A.2. More specifically, every reasonable social worker confronting this scenario in September 2013 would have known it was unconstitutional to remove N.D. from his home over Akey's objection without first making an exigency determination or obtaining a warrant. It has been clearly established for decades that the Fourteenth Amendment guarantees parents will not be separated from their children without due process of law unless the child faces imminent danger or some other emergency. *See Ram*, 118 F.3d at 1310 (holding that by 1993 "it was clear that a parent had a constitutionally protected right to the care and custody of his children and that he could not be summarily deprived of that custody without notice and a hearing except when the children were in imminent danger"); *cf. Santosky v. Kramer*, 455 U.S. 745, 770 (1982) (to terminate parental rights, state must conduct a hearing under a constitutionally proper standard). The Ninth Circuit has since reaffirmed this holding. *Rogers v. Cty. of San Joaquin*, 487 F.3d 1288, 1297 (9th Cir. 2007) (finding that in 2001 "the "law was clearly established . . . that a child could not be removed from the home without prior judicial authorization absent evidence of "imminent danger of serious bodily injury and [unless] the scope of the intrusion is reasonably necessary to avert that specific injury.") (citing cases); *see also Wallis*, 202. F.3d at 1138 (same); *Mabe*, 237 F.3d at 1108 (same); *see also Anderson–Francois v. Cty. of Sonoma*, 415 F. App'x 6, *9 (9th Cir. 2011) (same; affirming denial of qualified immunity where official "could have obtained a warrant within a few hours" because the children were not "in imminent danger").

Although these cases do not involve a factual scenario quite like the one at issue here, they collectively reveal that what happened here was an "obvious violation" such that the court need not find a "case on all fours prohibiting that particular manifestation of

13

unconstitutional conduct" to deny qualified immunity. *Deorle*, 272 F.3d at 1286;[5] *see also White*, 137 S. Ct. at 552 (no precise factual analogue required in obvious cases); *cf. Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (implying Ninth Circuit could look to its own precedent when assessing clearly established law); *Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011) (implying same).

Accordingly, Sutton and Myers are not immune from liability in the face of Akey's and N.D.'s procedural due process claims. Claims 3, 5, 9 and 11 will proceed to trial.

B.      Substantive Due Process (Claims 4, 6, 10, 12)

Akey and N.D. also contend Sutton and Myers violated their substantive due process rights by summarily removing N.D. from Akey's home and investigating the choking allegation with "bad faith." Pls.' Mem. at 9-10. As explained below, even construing all undisputed facts in plaintiffs' favor, no reasonable juror could find the stringent "shocks the conscience" standard met as required to sustain substantive due process claims.

1.      N.D.'s Removal

Parents and children have a "fundamental liberty interest in the companionship and society" of each other. *Crowe v. Cty. of San Diego*, 608 F.3d 406, 441 (9th Cir. 2010). A state actor's official interference with that liberty interest can amount to a substantive due process violation, but only if that interference is so egregious that it "shocks the conscience." *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 834 (1998). At times, the Ninth Circuit has articulated different standards for familial deprivation claims. *See Crowe*, 593 F.3d at 441 n.23 (analyzing a substantive due process claim where children placed in protective custody and defining requisite standard as "'unwarranted interference,' not conduct which 'shocks the conscience'") (citations omitted); *Lee v. City of Los Angeles*, 250 F.3d 668, 686 (9th Cir. 2001) (same). But the weight of authority supports using "shocks the conscience" as the applicable standard. *See Lewis*, 523 U.S.

_____

[5] The Supreme Court has twice "instructed the [Ninth Circuit] not to read [*Deorle*] too broadly in deciding whether a new set of facts is governed by clearly established law," *Kisela v. Hughes*, 138 S. Ct. 1148, 1154 (2018) (citing *City & Cty. of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1776 (2015)). Neither instruction applies to the general proposition for which this court cites *Deorle* here.

14

at 846 ("[T]he substantive component of the Due Process Clause is violated by executive action only when it can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense.") (citing *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 128 (1992); *see also Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008) (clarifying different standards Ninth Circuit applies to familial association claims all fall under the "shocks the conscience" umbrella standard; acknowledging "Supreme Court has made it clear . . . that only official conduct that 'shocks the conscience' is cognizable as a due process violation.") (citations omitted); *Estate of Diaz v. City of Anaheim*, No. SA-CV-121897-JVS-RNBx, 2013 WL 12207504, at *5 (C.D. Cal. Dec. 18, 2013) (using same standard after noting these inconsistencies); *Alberici v. Cty. of Los Angeles*, No. CV 12-10511-JFW (VBKx), 2013 WL 5573045, at *16 (C.D. Cal. Oct. 9, 2013) (same); *Kulya v. City & Cty. of San Francisco*, No. C 06-06539 JSW, 2008 WL 4415116 (N.D. Cal. Sept. 26, 2008) (same; noting "under the . . . circumstances presented to the social workers, they did not act in a manner so intentional and offensive as to shock the conscience").  The court thus applies the "shocks the conscience" standard here.

In this case, then, no reasonable juror could find that sending N.D. home with Dupree pending the abuse investigation's conclusion "shocks the conscience."  Plaintiffs have produced no evidence showing the decision of Sutton and Myers, even if relatively hasty and procedurally flawed, plausibly meets this high standard.  *Porter*, 546 F.3d at 1137 (recognizing the "overarching test . . . is whether the officer's conduct "shocks the conscience," which can be shown by proving "purpose to harm" or "deliberate indifference").  To the contrary, the record indisputably shows Sutton and Myers chose a minimally intrusive solution to advance the legitimate interest of protecting against possible child abuse.  *See Stanley v. Illinois*, 405 U.S. 645, 652 (1972) (states have a legitimate interest in separating neglectful or abusive parents from their children); *Mueller*, 700 F.3d at 1186 (emphasizing right to custody of one's child is especially limited where child may be in danger).

N.D., a three-year old child, alleged that his live-in stepfather tried to choke him, that his mother watched this but did nothing to help and CPS knew he would return to that home

absent action. DF 7, 14-16, 52. Sutton reviewed N.D.'s CPS file, which showed nine prior abuse

allegations involving N.D. and the various men Akey had been dating, with the latest allegation

pertaining to Cornacchioli. DF 8, 44. The allegation also seemed plausible: It came directly from

N.D. and was verified by his teachers and father, DF 7, 14-15, which is distinguishable from

cases involving incredible allegations or anonymous sources. *See, e.g.*, *Wallis*, 202 F.3d at 1138

(state officials acted on a "story of anticipated ritual murder by [the child's] father—a story that

would appear to an objective observer clearly to be founded in mental illness," as it came from an

"institutionalized mental patient, who had an extensive history of severe delusional disorders and

multiple personalities"); *Croft v. Westmoreland Cty. Children & Youth Servs.*, 103 F.3d 1123,

1126 (3d Cir. 1997) (emphasizing unreliability of a "six-fold hearsay report by an anonymous

informant stating that the mother had told a friend that [defendant] had abused [the minor

child.]"). N.D. made the same allegation to two of his teachers, to his father and to his father's

fiancée, all of whom verified that N.D. is an honest and trustworthy child. DF 19-27, 33-34.

That Dupree decided not to report the choking allegation himself when N.D. first

told him two days prior does not raise triable issues as to whether CPS's response was

conscience-shocking. When Sutton asked Dupree why he did not report the allegation, Dupree

explained his fear that neither Akey nor a court would take him seriously given the recent custody

battle. These reasons, which Sutton deemed credible, did not affect her evaluation of the veracity

or seriousness of N.D.'s allegation. Nor does Akey's denying the abuse raise triable issues.

Sutton ultimately gave Akey's denial minimal weight due to the countervailing evidence, Akey's

reported history of neglecting N.D. and Sutton's experience concerning false denials. DF 31;

*Devereaux v. Abbey*, 263 F.3d 1070, 1077 (9th Cir. 2001) (noting interviewers "must be permitted

to exercise some discretion in deciding when to accept initial denials at face value and when to

reject them (or withhold judgment on them) and proceed further"); *cf. Burke v. Cty. of*

*Alameda*, 586 F.3d 725, 733 (9th Cir. 2009) (removing child is reasonably necessary where "the

official reasonably believed that the mother was not protecting the child") (citation omitted).

Faced with this serious and plausible allegation, Sutton and Myers took swift

action: They asked Dupree to fetch N.D. from school while Sutton interviewed witnesses. Even

if this hasty decision triggers procedural due process violations, plaintiffs cite no evidence of ill-motive or any basis that could lead a juror could find this decision "shocks the conscience." *See Lee*, 250 F.3d at 685; *cf. Kulya*, 2008 WL 4415116, at *7 (finding no conscious shocking conduct where social worker "erred on the side of caution in not returning the child to the previous custody schedule which would have required placing [the child] back in the care of his father, against whom an investigation was pending.").

N.D.'s and Akey's substantive due process claims cannot survive summary judgment to the extent they are based on N.D.'s initial removal.

### 2. Abuse Investigation

Akey and N.D. also contend Sutton and Myers violated their substantive due process rights by conducting a "bad-faith" investigation in which they fabricated and suppressed evidence and ignored exculpatory leads. Pls.' Mem. at 19-21; *cf.* Compl. ¶¶ 63-66.

The Ninth Circuit has outlined broad parameters within which child-abuse investigations must fall to be deemed constitutional. *See Woodrum v. Woodward Cty., Okl.*, 866 F.2d 1121, 1126 (9th Cir. 1989) (noting "[m]ere negligence or lack of due care by state officials in the conduct of their duties does not trigger . . . substantive due process protections"); *see also Wood v. Ostrander*, 851 F.2d 1212 (9th Cir. 1988) (holding an intentional assertion of government power that tended to show a disregard of the plaintiff's physical safety may amount to gross negligence, recklessness or deliberate indifference sufficient for a substantive due process claim). As relevant here, Sutton's investigative techniques may give rise to a substantive due process claim only if a juror could conclude that Sutton should have known Cornacchioli was innocent, or that Sutton used investigative techniques so coercive she should have known they would "yield false information." *See Devereaux*, 263 F.3d at 1077; *accord Hall v. City of Los Angeles*, 697 F.3d 1059, 1068 (9th Cir. 2012). Evidence of a negligent or careless investigation, however, does not raise substantive due process concerns. *Devereaux*, 263 F.3d at 1076-77 ("Failing to follow guidelines or to carry out an investigation in a manner that will ensure an error-free result is one thing; intentionally fabricating false evidence is quite another."). Nor is it

enough to show, without more, that "[d]efendants used interviewing techniques that were in some sense improper, or that violated state regulations." *Id.* at 1075.

Here, plaintiffs argue defendants used coercive tactics and fabricated evidence. Specifically, they argue Sutton and Myers tried to force Akey to agree to the safety plan, and then when that failed, they falsely claimed Akey agreed to it. Pls.' Mem. at 23. Plaintiffs also argue Sutton falsely claimed she "inspected" Dupree's home before sending N.D. there. *Id.* (contrasting Sutton's deposition testimony that she only "looked over" the home, with statement in her investigative report that she "inspected" the home). The allegedly false statement about examining Dupree's home has no bearing on the substance of the abuse investigation and so is irrelevant to this claim. That Sutton and Myers may have tried to coerce Akey into agreeing to the safety plan is likewise irrelevant to this claim, as their alleged coercion yielded no information regarding whether Cornacchioli actually choked N.D. *Devereaux*, 263 F.3d at 1076. Neither fabrication, even if true, saves plaintiffs' substantive due process claims.

Plaintiffs also argue Sutton and Myers ignored exculpatory leads during their investigation. Pls.' Opp'n at 19. Yet plaintiffs do not identify with supporting evidence any specific leads defendants ignored. *See generally* Pls.' Opp'n; Pls.' Mem. Plaintiffs argue Sutton did not adequately interview Akey or Cornacchioli, but the evidence supporting this argument is that at best. *See* Pls.' Opp'n at 19 (noting this omission). Sutton phoned Akey before removing N.D., and personally interviewed Cornacchioli five days later. DF 29, 36. Given Akey's immediate and vehement denial of any abuse, Sutton elected not to interview her further. No reasonable juror could conclude Sutton's decision not to interview Akey again shows that Sutton "continued to investigate the abuse allegation knowing the culprit was innocent." *See Devereaux*, 263 F.3d at 1076-77 (noting interviewers "must be permitted to exercise some discretion"; emphasizing test is not whether investigation tactics would "ensure an error-free result," but rather whether interview tactics are likely to "yield false information"). Akey and Cornacchioli also say the allegation was implausible because Cornacchioli was out of town just before N.D. reported the abuse. DF 29, 36. But Sutton considered and rejected these statements, noting the alleged choking could have happened on September 10th or 11th, after Cornacchioli returned.

18

DF 37.  Sutton also considered N.D.'s statement that he "liked [Cornacchioli] and was not afraid of him": Sutton gave this statement little weight, reasoning that children often "like" their abusers.  DF 41.  On this record, which shows Sutton considered and explained her basis for rejecting these arguably exculpatory leads, no reasonable juror could conclude Sutton or Myers purposefully ignored exculpatory leads to such a degree that their conduct "shocks the conscience."

Finally, plaintiffs argue the family court's ultimate ruling in March 2014, which found "no evidence" of physical abuse, shows N.D.'s initial allegation was unsupportable and Sutton and Myers overreacted.  Pls.' Mem. at 29-30.  Because the analysis here focuses on Sutton's and Myers's motives and decisions during their investigation, however, the family court's subsequent ruling is irrelevant, as it involved different burdens and occurred after discovery and a full evidentiary hearing.  *See Cameron v. Brown*, No. 15-cv-00774-RGK (JPRx), 2016 WL 796011, at *6 (C.D. Cal. Feb. 22, 2016) (holding immaterial a factual dispute about information received "*after* the investigation had come to an end") (original emphasis), *rev'd on other grounds*, 721 F. App'x 612 (2017).

In sum, plaintiffs cite no evidence that could lead a reasonable juror to conclude defendants continued their investigation despite knowing Cornacchioli was innocent.  *Devereaux*, 263 F.3d at 1076; *accord Hall*, 697 F.3d at 1068.  Nor have plaintiffs cited any evidence showing coercive investigative techniques tending to "yield false information."  *Devereaux*, 263 F.3d at 1076.  At most, plaintiffs have shown negligence and undue haste.   Plaintiffs' evidence does not raise triable issues as to the kind of conscious-shocking conduct required to succeed on a substantive due process claim.  The court GRANTS summary judgment for Sutton and Myers on Claims 4, 6, 10 and 12.

C.    *Monell* Liability (Claims 1, 2, 7, 8)

Akey and N.D. also assert § 1983 claims against the County based on the due process violations described above.  A municipality faces liability when its policies, customs or practices cause civil rights violations.  *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 691(1978).  To establish liability, Akey and N.D. must raise triable issues as to their

19

underlying constitutional deprivations, and triable issues showing the County's policy or practice was the "moving force" behind that deprivation. *Mabe*, 237 F.3d at 1110-11 (citation omitted); *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011). Because only plaintiff's procedural due process claims survive summary judgment, not their substantive due process claims, the analysis here is restricted to the former. Akey and N.D. argue the County caused this violation by (1) inadequately training and monitoring its social workers, and (2) maintaining unconstitutional customs and practices. Pls.' Mem. at 23-28. As explained below, the first theory cannot survive summary judgment, but the second theory partially survives.

### 1. County Training and Supervision (Claims 2 and 8)

The § 1983 claim against the County based on inadequate training cannot survive. For this *Monell* claim to proceed to trial, plaintiffs must identify triable issues that the County "disregarded the known or obvious consequence that a particular omission in [its] training program would cause [municipal] employees to violate citizens' constitutional rights." *Flores v. Cty. of Los Angeles*, 758 F.3d 1154, 1158 (9th Cir. 2014) (citations and quotations omitted). Failure to train claims cannot survive based on the mere existence of training deficiencies or negligence within training and oversight policies; plaintiffs must identify a conscious or deliberate choice to ignore training deficiencies. *Dougherty*, 654 F.3d at 900; *Lee*, 250 F.3d at 681; *see also Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 410 (1997) (plaintiffs must prove "deliberate indifference" to constitutional rights, which requires "proof that a municipal actor disregarded a known or obvious consequence of his action."). Plaintiffs must also "present[ ] . . . evidence of prior incidents of the same character that would have made City officials 'aware of the situation such that the [City] could reasonably be said to have been deliberately indifferent to the need for further training." *Mueller*, 700 F.3d at 1194 (citation and quotations omitted).

Here, plaintiffs' inadequate training claim is too unsupported to withstand summary judgment. Plaintiffs declare the County's training is deficient in three broad areas: (1) "[C]onstitutional law pertaining to the parent-child relationship"; (2) "what constitutes exigent circumstances"; and (3) safety assessment tools. Pls.' Mem. at 27. Plaintiffs identify no evidence

20

showing the County knew about its purportedly deficient training before this incident: Plaintiffs reference only one other incident and it occurred after the incident here.  *See* Ex. 5 to ECF No. 139-1 (Lori Phu Gov't Claim, filed in September 2015).  Nor do plaintiffs cite any evidence showing the County made a deliberate choice to disregard particular omissions in its training program.  Accordingly, the court GRANTS summary judgment for the County on Claims 2 and 8.

### 2. County Practices (Claims 1 and 7)

Akey and N.D. also argue two specific County practices are unconstitutional.  Their claims survive as to one practice, but not the other.   Pls.' Mem. at 24-27.

Plaintiffs first cite the practice of removing children from their homes using oral, rather than written, safety plans, as a driving force behind plaintiffs' constitutional injuries.  Pls.' Mem. at 23-24.  To avoid summary judgment on this theory, plaintiffs must raise a dispute of fact as to whether this particular County practice caused the constitutional deprivation plaintiffs suffered.  *Wallis*, 202 F.3d at 1135; *Dougherty*, 654 F.3d at 900.

Here, the violation plaintiffs cite is that N.D. was removed based on Myers' "belief" that Akey orally agreed to a safety plan, when in fact she did not.  *See supra* Part IV.A.2.  To prove a County practice drove this procedural due process violation, plaintiffs cite evidence that the County systematically allows social workers to remove children by getting parents to orally agree to safety plans, even when written safety plans are feasible.  PF 50-54 (plaintiffs' retained expert Timothy Turner's written report confirming this practice).  Removing children without a signed safety plan is not inherently unconstitutional and plaintiffs' expert concedes this point.  *See* Turner Dep. 51:7-13, 54:24-55:12 (ECF No. 141-3, Defs.' Ex. M) (Q: "Would you agree that if Miss Akey had in fact agreed to the custody arrangement, that there would be no constitutional violation by the county?"  A. "If she agreed to it under free will."  Q. "And it doesn't matter whether they had agreed to it orally or in writing . . . There's still no constitutional violation, right?"  A. "Yes . . . .").  But the practice can, as here, spawn repeat constitutional violations when social workers rely exclusively on unverifiable oral agreements.

As reviewed above, Sutton and Myers argue they "believed" Akey orally agreed to a safety plan, but Akey vehemently denies she did.  *See supra* Part IV.A.2.  With no written

document to prove consent, whether any agreement exists is reasonably disputed. If the County had mandated a written safety plan, there would be no confusion: Akey's refusal to sign would be unambiguous and Sutton and Myers would have been required to find an alternative basis to remove N.D. Had Sutton and Myers known the County mandated a written safety plan, Sutton could have driven two miles to present a written agreement to Akey, rather than rely on an unverifiable oral agreement. PF 48. A reasonable juror could find the County's practice drove plaintiffs' constitutional injury. Akey and N.D.'s *Monell* claim survives summary judgment as to the practice of not requiring a written agreement.

The second County practice plaintiffs cite permits removals based on telephonic exigency assessments rather written safety-assessment forms. Akey Opp'n at 25-27. Neither Sutton nor Myers made an oral exigency assessment here. Instead, concluding Akey had agreed to the safety plan, Sutton and Myers declined to do any exigency assessment, telephonic or otherwise. DF 85. This particular practice, therefore, did not "drive" the constitutional injury at issue here. The court GRANTS summary judgment for the County to the extent plaintiffs' *Monell* claims derive from this policy.

Claims 1 and 7 will proceed to trial, but only as to the practice of permitting removal based on oral safety plans when written safety plans are feasible.

## V.     AKEY'S AND N.D.'S STATE CLAIMS (Claims 16-23)

Akey's and N.D.'s state law claims, which mirror the federal claims discussed above, each derive from Sutton's and Myers' investigatory decisions and their decision to remove N.D. from Akey's home pending the abuse investigation. Pls.' Mem. at 30-32. Defendants contend they are immune from liability on each claim. Defs.' Mem. at 18-19. The court agrees.

California Government Code section 820.2 immunizes public employees from liability for injuries they caused through an "act or omission" if that act or omission "was the result of the exercise of the discretion vested in [them]." Cal. Gov't Code § 820.2. This immunity applies even if "such discretion [is] abused." *Id.* Although broad, discretionary immunity is not limitless: It applies only to "basic policy decisions" or "quasi-legislative policy making" decisions, not to "lower-level, or 'ministerial,' decisions that merely implement a basic

22

policy already formulated." *Caldwell v. Montoya*, 10 Cal. 4th 972, 981 (1995) (citation and quotations omitted). Courts consistently apply section 820.2 immunity to a social worker's intentional or negligent decisions made during child abuse investigations, including decisions regarding where to place allegedly abused children. *See Cty. of Los Angeles v. Superior Court*, 102 Cal. App. 4th 627, 644-46 (2002) (decisions regarding who should care for "dependent children seems to us to be an activity loaded with subjective determinations and fraught with major possibilities of an erroneous decision . . . . and that the discretionary decisions made in connection therewith should be deemed beyond the proper scope of court review.") (citation and quotations omitted); *Ronald S. v. Cty. of San Diego*, 16 Cal. App. 4th 887, 897-99 (1993); *Alicia T. v. Cty. of Los Angeles*, 222 Cal. App. 3d 869, 882-83 (1990); *see also Shuey v. Cty. of Ventura*, No. 2:14-CV-9520-ODW-SHX, 2015 WL 6697254, at *4 (C.D. Cal. Nov. 3, 2015); *Clarke v. Upton*, No. CV-F-07-888 OWW/SMS, 2008 WL 2025079, at *8 (E.D. Cal. May 9, 2008).

Here, Sutton and Myers are immune from liability on Akey's and N.D.'s state claims. Akey and N.D. attempt to invoke a "malice" exception by arguing Sutton and Myers maliciously fabricated evidence, ignored exculpatory leads and obtained testimony through duress. Pls.' Mem. at 29; *see* Cal. Gov't Code § 820.21 (codifying the malice exception which denies immunity to the following acts if "committed with malice": Perjury, evidence fabrication, evidence suppression, and coerced testimony). Yet, as detailed above, plaintiffs provide no evidence showing defendants fabricated or suppressed any relevant evidence. *See supra* Part IV.B. Nor do plaintiffs cite any evidence showing defendants obtained testimony by coercion or duress. *Id.* Though defendants pressured Akey into consenting to a safety plan, that act constitutes a discretionary decision subject to state law immunity. *Shuey*, 2015 WL 6697254, at *4 ( explaining section 820.21 does "does not encompass . . . the allegations in the FAC" one of which was "coercing Shuey to sign the Safety Plan").

Finally, Akey and N.D. argue state law immunity should not apply because the investigation and removal were done in "bad faith." Pls.' Mem. at 29. But "bad faith" is not one of the bases expressly listed within the malice exception. *See* Cal. Gov't Code § 820.21.

1   Plaintiffs identify no case denying discretionary immunity based on bad faith, and the court

2   declines to do so here. *Cf. Christina C. v. Cty. of Orange*, 220 Cal. App. 4th 1371, 1381-82

3   (2013) (rejecting similar argument; explaining "[section 820.21] is not a blanket exception for

4   every conceivable act that may be done with malice. By its terms, the immunity exception in

5   section 820.21 is limited to specific instances of misconduct, including perjury."). Even if

6   defendants removed N.D. "maliciously," removing a child is a discretionary decision subject to

7   immunity. *Id.* at 1382 ("The Legislature has not listed the malicious removal of a child as an act

8   that would revoke a social worker's immunity.").

9           Both Sutton and Myers are entitled to discretionary immunity. The court

10  GRANTS summary judgment for Sutton and Myers on claims 16, 17, 18, 19, 21 and 22. The

11  County is therefore immune from vicarious liability for these discretionary actions. Cal. Gov't

12  Code § 815(a). The court GRANTS summary judgment for the County on claims 20 and 23.

13  VI.     CORNACCHIOLI'S CLAIMS (Claims 14, 15, 24, 25, 26)

14          A.      Merits

15          Cornacchioli alleges state and federal procedural due process violations based on

16  Myers' reporting him to the DOJ Index without a hearing. Compl. ¶¶ 172, 220, 226. Yet the

17  undisputed facts show that because of a clerical error, Cornacchioli was never reported to or

18  placed upon the DOJ Index. DF 77-82. County staff confirmed the report was never mailed to

19  the DOJ. DF 79. Cornacchioli offers no evidence to the contrary. *See* Pls.' Opp'n at 5-6. No

20  reasonable juror could find, based on this record, that Cornacchioli was ever reported to the DOJ

21  Index. There is also no basis for Cornacchioli's due process claims on N.D.'s removal, as

22  Cornacchioli did not have custody of N.D. *See* DF 4. The court GRANTS summary judgment

23  for defendants on claims 14, 15, 24, 25 and 26.

24          B.      Motion to Amend Claim 15

25          The court also denies Cornacchioli's request to amend claim 15 as the deadline for

26  amendments has long passed. *See* Mot. Amend, ECF No. 136; Mem., ECF No. 136-1. Plaintiffs

27  amended their complaint four times. *See* ECF Nos. 20, 29, 38, 109. Plaintiffs now ask to add

28  allegations that Myers knew Cornacchioli stopped trying to find a law enforcement job because

he believed CPS had reported him to the DOJ Index.  Mem. at 2.  Yet Cornacchioli does not explain why he never included this allegation in any previous amendment.  He has known about the facts giving rise to this allegation since at least January 2014, ten months before plaintiffs filed their first complaint.  *See id.* (citing relevant conversation with Myers from January 2014); Initial Compl., ECF No. 1 (filed October 2014).  Adding new allegations now, after discovery has closed and after both parties have moved for summary judgment, would unduly prejudice the defense.  Given the timing, defendants cannot investigate and probe any additional claimed damages.  Finally, as in their prior motions to amend, plaintiffs analyze their request under Rule 15(a)'s liberal amendment policy, despite this court's previous order clarifying the more stringent Rule 16(b) good cause standard applies.  May 5, 2017 Order, ECF No. 107; *see also Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 608-09 (9th Cir. 1992).

Finding no good cause, the court DENIES plaintiffs' request to amend their complaint for a fifth time.  *See Ascon Props., Inc. v. Mobil Oil Co.*, 866 F.2d 1149, 1161 (9th Cir. 1989) (emphasizing court's discretion in denying an amended complaint is especially broad "where the court has already given a plaintiff one or more opportunities to amend [its] complaint.") (citation omitted).

VII.   <u>CONCLUSION</u>

The court DENIES plaintiffs' motion for summary judgment and DENIES plaintiffs' motion to amend.  The court adjudicates defendants' motion for summary judgment as follows: GRANTS summary judgment for defendants on Claims 2, 4, 6, 8, 10, 12, 16-26; DENIES summary judgment for defendants on Claims 3, 5, 9, 11; and GRANTS in PART and DENIES in PART summary judgment for defendants on Claims 1 and 7, as detailed above.

The following six claims will proceed to trial: Claims 1, 3, 5, 7, 9 and 11.  A final pretrial conference on these claims is scheduled for September 21, 2018, at 10:00 a.m., with a joint pretrial status report due 21 days prior.

IT IS SO ORDERED.  This resolves ECF Nos. 135, 136 and 138.

DATED:  August 13, 2018.

UNITED STATES DISTRICT JUDGE

25